657 So.2d 1072 (1995)
STATE of Louisiana
v.
Donald Ray HARRIS.
No. KA 94 0696.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*1074 Doug Moreau, Charles Grey, Dist. Attys. Office, Baton Rouge, for appellee State of Louisiana.
David Price, Public Defender, Baton Rouge, for defendant-appellant Donald Harris.
Before FOIL, WHIPPLE and KUHN, JJ.
WHIPPLE, Judge.
The defendant, Donald Harris, was charged by bill of information with possession with intent to distribute cocaine, a violation of LSA-R.S. 40:967(A). The defendant pled not guilty and, after trial by jury, was found guilty of the responsive offense of possession of cocaine, a violation of LSA-R.S. 40:967(C). He subsequently was sentenced to five years at hard labor with credit for time served. The defendant has appealed, urging the following assignments of error:
1. The trial court erred in denying the defendant's special requested jury charges.
2. The trial court erred in accepting a verdict not supported by sufficient evidence.
3. The trial court erred in imposing an excessive sentence and failing to consider and apply the sentencing guidelines of LSA-C.Cr.P. art. 894.1.
In his brief to this Court, the defendant expressly abandoned assignment of error number one.

ASSIGNMENT OF ERROR NUMBER TWO
The defendant contends in his second assignment of error that the trial court erred in accepting a verdict not supported by sufficient evidence. He argues that he did not directly possess cocaine and, because there were four other adults in the house when the cocaine was found and he was arrested, the state failed to negate the reasonable hypothesis that someone else possessed the cocaine. The defendant claims that, although the evidence showed that he associated with persons who used illegal drugs, the evidence was insufficient to show his knowing and intentional possession of cocaine.
Initially, we note that, in order to challenge this conviction on the basis of insufficiency of the evidence, the defendant should have proceeded by way of a motion for post-verdict judgment of acquittal. See LSA-C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. See State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
In reviewing claims for the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). In conducting this review, we must be mindful of Louisiana's circumstantial evidence test, i.e., "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. See State v. Northern, 597 So.2d 48, 50 (La.App. 1st Cir.1992). The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 473 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
To support a conviction of possession of a controlled dangerous substance, the state must prove that the defendant was in possession of the illegal drug and that he knowingly or intentionally possessed the drug. State v. Spates, 588 So.2d 398, 400 (La.App. 2d Cir.1991). Guilty knowledge therefore is an essential element of the crime of possession. State v. Edwards, 354 So.2d 1322, 1327 (La.1978). A determination of whether or not there is "possession" sufficient to convict depends on the peculiar facts *1075 of each case. State v. Trahan, 425 So.2d 1222, 1226 (La.1983).
To be guilty of the crime of possession of a controlled dangerous substance, one need not physically possess the substance; constructive possession is sufficient. State v. Guirlando, 491 So.2d 38, 40 (La.App. 1st Cir.1986). In order to establish constructive possession of the substance, the state must prove that the defendant had dominion and control over the contraband. State v. Bell, 566 So.2d 959, 959-60 (La.1990). A variety of factors are considered in determining whether or not a defendant exercised "dominion and control" over a drug, including: a defendant's knowledge that illegal drugs are in the area; the defendant's relationship with any person found to be in actual possession of the substance; the defendant's access to the area where the drugs were found; evidence of recent drug use by the defendant; the defendant's physical proximity to the drugs; and any evidence that the particular area was frequented by drug users. See State v. Tasker, 448 So.2d 1311, 1314 (La.App. 1st Cir.), writ denied, 450 So.2d 644 (La.1984). See also State v. Love, 527 So.2d 62, 64 (La.App. 3d Cir.1988).
The mere presence in the area where narcotics are discovered or mere association with the person who does control the drug or area where it is located is insufficient to support a finding of possession. State v. Tasker, 448 So.2d at 1314. Additionally, being a resident of the premises where drugs are found is not in and of itself sufficient to prove constructive possession. State v. Pollard, 93-1960, p. 12 (La.App. 4th Cir. 7/14/94); 640 So.2d 882, 888. Nevertheless, a person found in the area of the contraband can be considered in constructive possession if it is subject to his dominion and control. The defendant can have constructive possession if he jointly possesses drugs with a companion and if he willfully and knowingly shares with his companion the right to control the drugs. State v. Pollard, 93-1960 at 12; 640 So.2d at 888.
The question in this assignment of error is whether or not under Jackson v. Virginia a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence that the defendant had dominion and control over the cocaine found in the house and the car and knowingly possessed it. See State v. Trahan, 425 So.2d at 1226.
Officer Frank Caruso of the Baton Rouge City Police Department testified that he and other narcotics personnel executed a search warrant at a home on Fairfields Avenue on August 27, 1991, between 11:30 p.m. and 12:00 a.m. The basis for the search warrant was information provided by a confidential informant (CI) who purchased cocaine from someone in the residence[1]. Caruso stated that he and his partner kept the CI under surveillance and they saw him enter and exit the residence. Caruso stated that the CI gave him a description of the person from whom he purchased the cocaine and he obtained a search warrant to search the premises based on the information. Caruso testified that he was given a name and a description of the person "associated with the residence" but he did not state the name or the description.
Caruso and the other officers entered the residence on Fairfields Avenue by busting through the front door with a door ram. He and the other officers then attempted to secure each room. Caruso went to the rear of the residence and to the rear bedroom. The door of the rear bedroom was locked, so he kicked the door open, and found the defendant and a woman, Zeretta Corbin, in bed. He secured them and placed them in the front room with the three other adults that were in the house. Caruso stated that both the defendant and the woman were undressed at the time he found them. They dressed with clothing located within the bedroom. After the officers secured everyone in the house in one room, they then searched the residence. Caruso stated that there was *1076 a total of nine people in the house, five adults and four young children. The four children were found in the middle bedroom, and Caruso thought that they were Corbin's children. Caruso indicated initially that the other three adults were found in the front of the house. After reviewing his report, he testified that two of the adults were in the front room and Vernell Jackson was in the front bedroom.
Caruso testified that in the rear bedroom where Corbin and the defendant were found, the officers recovered a brown paper bag that contained two plastic bags. One of the plastic bags contained eleven small plastic bags of cocaine, and the other plastic bag had twelve small plastic bags of cocaine.
Caruso also testified that cocaine was found in a large men's tennis shoe and in the battery compartment of a large "jam box" radio which were located in the same bedroom. A Xanax tablet and drug paraphernalia were also found in Corbin's purse which was in the bedroom. He also confiscated $135.00 from the defendant. In the front bedroom, on the dresser, the officers found a bottle of inositol powder (which Caruso identified as a cutting agent commonly used to cut cocaine), a syringe, a spoon, and a small vial. Homemade "drug smoking" pipes were found in plain view on a dresser in the rear bedroom where the defendant and Corbin were found and on the kitchen counter. Caruso stated that he found most of the drug paraphernalia. The officers did use a drug detection dog to find some of the drugs in the house.
On cross-examination, Caruso explained that he had given the CI a marked twenty dollar bill just prior to his making the drug buy. When the CI returned, he did not have the marked bill. Caruso stated that he saw the CI enter and leave the residence on Fairfields Avenue but did not see the actual drug transaction take place. Caruso further stated that he was not aware of who was in the house when he entered the house, but he knew that other individuals were in the house.
Caruso stated that there were "numerous personal items," including items of clothing and shoes for men and women, in the room where the defendant was found. Caruso did not personally ascertain that an automobile in the defendant's driveway belonged to the defendant but he remembered one of the other officers stating that it was the defendant's vehicle. Caruso also admitted that he did not find the marked money among the $135.00 dollars that he confiscated from the defendant.
Officer Dennis Smith of the Baton Rouge City Police Department was qualified as an expert in the field of packaging, distribution, and sales of cocaine on the street. Smith testified that he was involved in the search of a residence on Fairfields Avenue on August 27, 1991, at approximately 11:30 p.m. He secured the rear of the house while the other officers entered the residence from the front. Smith explained that they used a "no-knock search warrant" in order to utilize the element of surprise. He stated that upon his entry into the house, all of the residents of the house, except the children, were already in the front room. Smith stated that he seized cocaine from the battery compartment of a "jam box" radio from the rear bedroom that had been occupied by the defendant and Corbin. He did not seize any other cocaine. He observed the other officers seize cocaine from inside a tennis shoe and from underneath the bed in the rear bedroom where defendant was found. Smith stated that he later helped in the search of the vehicle parked in the defendant's driveway. He stated that he was asked to obtain the keys for the vehicle so he asked the defendant for the keys to the car in the driveway, "specifically the trunk." The defendant gave Smith the keys from atop the television set. Smith then gave the keys to Officer Wally Cowart who was in charge of the drug detection dog. After he gave the keys to Cowart, who was outside by the vehicle to be searched, Smith returned inside the house. Smith stated that he seized $135.00 from the defendant and then gave the money to Caruso.
On cross-examination, Smith stated that he ascertained that the vehicle in the driveway belonged to the defendant because he asked the defendant if the vehicle was his and the defendant responded that it was. He stated *1077 that the defendant handed the vehicle's keys to him.
Officer Brandon Hyde testified that he participated in the execution of the search warrant at the Fairfields Avenue residence. He entered the residence and seized cocaine from the rear bedroom. When he arrived in the bedroom, the defendant and a female were in the room. The cocaine that he seized from the room was in a plastic bag stuffed inside a large white tennis shoe. He stated that the shoe appeared to be a men's shoe and that there was male and female clothing in the room. He stated that the tennis shoe was the only item that he seized. He was not involved in the search of the car.
On cross-examination, Hyde stated that the defendant was present in the rear bedroom when the officers opened the door. He admitted that he found both male and female clothing in the room. However, he admitted that he did not take anything from the room that had the defendant's name on it or any other identifying items. He stated that he found the tennis shoe with the cocaine in it on the floor against the wall and not in a closet.
Officer Wally Cowart of the Baton Rouge City Police Department testified that he works with narcotics dogs. He and a narcotics dog accompanied the other police officers to execute a search warrant on Fairfields Avenue. He entered the residence and the dog alerted to an area in the rear bedroom under the bed. The officers retrieved a bag of cocaine from under the bed. He stated that the dog also alerted to an area in the kitchen; however, no drugs were found in that area. Subsequently, Cowart left the house and searched a car that was parked in the driveway and the dog alerted to a portable tape player in the trunk of the car. Cowart found cocaine in the battery compartment of the tape player. No other drugs were found in the car.
Vernell Jackson testified that she was present at the Fairfields Avenue house during the instant search and that she was arrested. She testified that sometime after January 1, 1992, she received a letter from the defendant about the instant incident.
On cross-examination, Jackson admitted that she had also been charged with possession with the intent to distribute cocaine and that she lived in the Fairfields Avenue home with the defendant. Jackson stated that she did not receive the letter directly from the defendant; rather, she obtained the letter from Corbin who stated that the defendant told her to give the letter to her.
The defendant testified that he lived at the residence on Fairfields Avenue and considered it to be his permanent address. He was present at the house on Fairfields Avenue on August 27, 1991, when the police arrived, but he had returned about one half hour earlier because he had gone to get something to eat. While he was out of the house, he called Zeretta Corbin, who was staying at the house with him, and she told him he needed to return home because she wanted to go out later that night. When he arrived home, he went to the rear bedroom to see Corbin and was in the bedroom with her when the police arrived shortly thereafter. He stated that although he and Corbin were not married, she was "like [his] common law wife."
The defendant stated that he was dressed and laying on the bed and Corbin was on the floor ironing her pants. He heard noise at the front of the house and thought some people were fighting. He then heard two knocks on the bedroom door, so he stood up and looked around for something to grab because he thought someone might be trying to rob him. The police then entered the room and pointed guns at them. He did not know it was the police at the door until they entered the room. The defendant claimed that the door to the bedroom was not locked. He further noted that the front door was not locked but the officers knocked it down anyway. When the officers first entered the room, he thought that they wanted to search him, so he pulled down his pants. The officer told him to put his pants back on and to go into the front room, which was the living room. He stated that both he and Corbin were dressed at the time. He, Corbin, Melvin Hawkins, Vernell Jackson, Zandie Williams, and Corbin's four children were together in the living room. They were all residents of the house except for Williams. *1078 Williams was at the house because she and Corbin were going out that night. The defendant testified that he was only in the rear bedroom because of Corbin and that his bedroom was the front bedroom and not the rear bedroom. The rear bedroom was a guest room for people to use when they stayed at his home.
The defendant stated that the other three adults who lived in the house had access to the entire house. Additionally, a number of guests stayed at the house. He stated that he was away from the house periodically. He admitted writing a letter to Jackson, concerning the ownership of the drugs seized, because she had told him that she was going to admit the drugs were hers. He stated that he just wanted the person who actually possessed the cocaine to step forward and take the blame.
On cross-examination, when the prosecutor asked the defendant if the car parked in the driveway of his house was his, the defendant stated that he was not sure because there were two cars parked in his driveway on the evening that the search took place. He claimed that both cars were Cadillacs but they were from two different years. However, he stated that if it was the 1981 model that had been searched, it was his car. He testified that the car keys were left on top of the television so others in the house could use the cars. He claimed that the residents of the house had access to the cars. The defendant denied giving the police officer the keys to the car. He stated that the officer asked him where were the keys to his vehicle, and he told him that they were on top of the television set. The police officer then retrieved a set of car keys from the television set.
The defendant denied that the tape player found in the trunk of the car belonged to him and claimed he did not know to whom the tape player belonged. He was unable to remember the last time he was in the trunk of his car. He had some work done on the car, and he speculated that the people working on his car may have left the tape player in the trunk.
The defendant admitted that he owned the house on Fairfields Avenue and paid all of the bills. He stated that the other people who resided at the house with him, with the exception of Corbin, did not own the house. He denied that any of the cocaine or the items in which the cocaine was found belonged to him. He stated that the radio found in the rear bedroom was not his and that it belonged to someone named "Missy" who previously had visited the house and left the radio. The defendant stated that he had never seen the homemade drug pipes in his house. The defendant denied seeing the tennis shoes found in the rear bedroom and stated that he did not know if they were his shoes. However, he admitted that the tennis shoe "could have been [his]." He stated that "most" of his shoes were kept in the front bedroom because that was his bedroom. The defendant admitted that some of his clothes "probably" were in the rear bedroom, but most of his clothes and personal belongings were in the front bedroom.
He testified that he did not recall seeing Corbin's purse, which was found in the rear bedroom, and that he did not know whether or not the purse belonged to Corbin as he had never seen it. He denied knowing anything about the Xanax tablet discovered by the police officers and stated that he had never seen it in Corbin's purse.
The defendant stated that he had never seen the cocaine found by the police officers in his house. The defendant stated that he supported himself by doing odd jobs and that he had retirement money. The defendant claimed that people who came to his house did not let him see them use drugs because he was against drug use. However, the defendant admitted that he had "purchased cocaine for women before that [he] knew."
The defendant admitted that he was at home part of the day on August 26 and August 27, but noted that during that time, other residents were at the house with him. He stated that he was not sure if Williams was present on the 26th. The defendant stated that he did not recall having any visitors on August 26, but that there may have been visitors at the house.
In the instant case, the defendant admitted that he owned the house in which the drugs *1079 were found. Although he claimed that the rear bedroom in which he and the cocaine were found was not his, he was in that room with the door locked when the warrant was executed. He admitted that some of his clothing and personal items were in the room. Drugs were found under the bed on which the defendant had been lying and in a tennis shoe which the defendant admitted "could have been [his]." The defendant was found in the room undressed and then dressed himself with items of clothing from within the room. Additionally, a homemade "drug smoking" pipe was found in plain view on a dresser in the room. Drug paraphernalia also was found in plain view in the front bedroom, which was the room that the defendant claimed to be his room. A homemade "drug smoking" pipe also was found in plain view on the kitchen counter. Cocaine was found also in the trunk of the car in the defendant's driveway. Although the defendant claims that there was a similar car in the driveway that did not belong to him, no other witness mentioned another car being in the driveway, and the police officers testified the defendant identified the car in which the drugs were found as his and gave them the keys.
We find that the defendant had dominion and control over the cocaine found in his house and vehicle. Because there was drug paraphernalia in plain view in various areas of the house, the defendant had knowledge of illegal drug use in the area. The defendant stated that the room in which the drugs were found belonged to Corbin, whom he claimed to be his "common-law wife." The defendant had access to the areas where the drugs were found as they were discovered in the house owned and lived in by the defendant and locked in the trunk of defendant's car to which he had the keys. Additionally, the drugs were found inside a bedroom in the defendant's house in which defendant had locked himself when the police arrived at the house. There was also evidence that the area was frequented by drug users as there was drug paraphernalia found in plain view inside the house and a CI recently had bought drugs at the house.
The guilty verdict returned in this case indicates that, after considering the credibility of the witnesses and weighing the evidence, the jury accepted the testimony of the state witnesses and rejected that of the defense witnesses. This Court will not address the credibility of the witnesses or reweigh the evidence.
After a careful review of the record, we find that a rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact finder can, could have concluded that the state proved beyond a reasonable doubt that the defendant was guilty of possession of cocaine and that the evidence negated any reasonable hypothesis of innocence. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
In his third assignment of error the defendant contends that the trial court erred in imposing an excessive sentence and in failing to consider and apply the Louisiana Sentencing Guidelines. The defendant also argues that he should not have been sentenced to the maximum sentence. The defendant was sentenced on August 7, 1992; therefore, the new sentencing guidelines apply.
According to the record before us, the defendant failed to file or make a motion to reconsider sentence. Additionally, neither the transcript of the sentencing hearing nor designation of the record was included in the record; therefore, we are unable to determine whether or not the defendant made an oral motion for reconsideration of sentence. Furthermore, neither the defendant's brief nor the state's brief claims that the defendant filed or made a motion to reconsider sentence. Therefore, under the provisions of LSA-C.Cr.P. art. 881.1 A(1), (2), and D, the defendant is precluded from raising his objections to excessiveness of the sentence and compliance with the sentencing guidelines on appeal. State v. Myles, 616 So.2d 754, 759 (La.App. 1st Cir.), writ denied, 629 So.2d 369 (La.1993). This assignment of error is also without merit.

*1080 CONCLUSION
For the above and foregoing reasons, the defendant's conviction and sentence for possession of cocaine are hereby affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Although it is not clear from Caruso's testimony when the CI purchased cocaine from the Fairfields Avenue residence, subsequent testimony indicates that the purchase was made on or about August 26, 1991.